# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 1:25MJ 168
)
THE PREMISES LOCATED AT )
3007 W. WEAVER STREET, APT 9 )
DURHAM, NORTH CAROLINA )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Attachment A

located in the _____Middle_____ District of _____North Carolina_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Conspiracy to Distribute Cocaine and Fentanyl |
| 21 U.S.C. 841 | Possession with Intent to Distribute Cocaine and Fentanyl |

The application is based on these facts:
See Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Eric S. Nye
*Applicant's signature*

Eric S. Nye, Special Agent FBI
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 5/2/2025

*Judge's signature*

City and state: Winston-Salem, North Carolina    Hon. Joi Elizabeth Peake, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) <br> THE PREMISES LOCATED AT ) <br> 3007 W. WEAVER STREET, APT 9 ) <br> DURHAM, NORTH CAROLINA ) | Case No. 1:25mJ168 |

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

Eric Nye, Special Agent (SA), Federal Bureau of Investigation (FBI), Charlotte Division (CE), Raleigh-Durham Resident Agency, Cary, NC, being duly sworn, states the following:

**INTRODUCTION**

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18 U.S.C. § 2516.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since 2006. I have authored, executed, and/or participated in over fifty search and seizure warrants for illegal narcotics and related paraphernalia. I have participated in the operation and execution of over thirty Federal and State Title III orders. I have arrested and/or participated in the arrest of over 100 persons for violations of State and Federal narcotics statutes. I am currently assigned to investigate violent gangs in the Durham metropolitan area as a member of the FBI's Raleigh-Durham Safe Streets Task Force (RDSSTF) and have received over 100 hours of specialized training in the area of illegal narcotics and violent street gangs.

1

3. Through instruction and my participation in investigations, I have become familiar with the manner in which gang members and narcotics traffickers conduct their illegal business, and the methods, language, and terms that they use to disguise conversations about their gang and narcotics activities. Additionally, I have become familiar with gang members' methods of operation, including gang organizational structure, their methods of violence, their distribution, storage, and transportation of narcotics, and how they obtain and transport firearms. Through my experience and training, I have learned that gang members and narcotics traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities. I also have learned that gang members and narcotics traffickers rarely refer to heroin, cocaine, cocaine base (also known as "crack"), phencyclidine (PCP), or other illegal drugs expressly by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, narcotics traffickers routinely refer to drugs, drug quantities, and drug prices by using seemingly innocuous words or phrases. I also know that gang members and drug traffickers frequently have access to several cellular telephones and that they periodically use newly acquired cellular telephones, all in an effort to avoid detection and to avert law enforcement efforts. I also know that gang members and drug traffickers communicate via text message to discuss types, quantities, and prices of narcotics, as well as to discuss meeting locations, all in an effort to elude detection and to impede the efforts of law enforcement. I also know gang members to maintain documents, both physical and digital, on their persons and/or in their residences. These documents often refer to gang knowledge, history, rules, and information provided by national-level gang leadership. These documents are often hidden inside of legitimate documents, or written in code, to thwart

2

law enforcement attempts to glean any intelligence concerning the criminal enterprise, its rules, or its membership.

4. This affidavit is made in support of an application for a warrant to search the premises located at **3007 W. Weaver Street, Apt 9, Durham, North Carolina** (SUBJECT PREMISES). This affidavit is based upon information I have gained through this investigation, as well as information from other law enforcement officers and individuals associated with this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 21, United States Code, Section 846 is stored within the above-mentioned premises located at **3007 W. Weaver Street, Apt 9, Durham, North Carolina**.

### Investigation into Kevin Johnson and Khuram Choudhry

5. The RDSSTF reinitiated their investigation of KEVIN JOHNSON in early 2025. Investigators determined that JOHNSON was selling cocaine and fentanyl from both 5114 Copper Ridge Drive, apartment 303, in Durham, North Carolina, and from the Cornwallis Projects neighborhood of Durham, North Carolina. On March 24, 2025, interception of wire communications to and from JOHNSON's phones (TT1, TT2, and TT4) was authorized. Through the monitoring of these lines, your affiant has determined that JOHNSON is distributing large amounts of cocaine and fentanyl in the Durham area, and he is obtaining a portion of these controlled dangerous substances from KHURAM CHOUDHRY (TT3).

6. Through recent investigations, it has been determined that one of JOHNSON's co-conspirators is Jerrell GREEN. GREEN utilizes his residence located at **3007 W. Weaver Street, Apt 9, Durham, NC**, to store and distribute the narcotics and illicit proceeds. As mentioned infra, this conspiracy has been documented through court authorized Wire and Electronic intercepts, Confidential Human Source (CHS) reporting, Under Cover Employee (UCE) operations, pen

3

register and toll records, surveillance, court authorized geolocation data, consensually monitored calls, controlled purchases of narcotics, and other investigative techniques

7. On March 24, 2025, the Honorable Catherine C. Eagles, Chief United States District Judge for the Middle District of North Carolina, authorized the interception of wire communications to and from a telephone with the number (984) 278-8782 (TT1), a phone known to be used by KEVIN JOHNSON; and telephone with the number (984) 327-6595 (TT2), a phone known to be used by KEVIN JOHNSON.

8. On April 22, 2025, the Honorable Catherine C. Eagles, Chief United States District Judge for the Middle District of North Carolina, reauthorized the interception of wire communications to and from a telephone with the number (984) 278-8782 (TT1), a phone known to be used by KEVIN JOHNSON; the interception of wire communications to and from a telephone with the number (984) 327-6595 (TT2), a phone known to be used by KEVIN JOHNSON; authorized the interception of wire communications to and from a telephone with the number (919) 454-6301 (TT3), a phone known to be used by KHURAM CHOUDHRY; and authorized the interception of wire communications to and from a telephone with the number (984) 278-8570 (TT4), a phone known to be used by KEVIN JOHNSON.

### 3007 W Weaver Street, Apt 9, Durham North Carolina

9. As noted supra investigators determined that JOHNSON was selling cocaine and fentanyl from both 5114 Copper Ridge Drive, apartment 303, in Durham, North Carolina, and also from JERRELL GREEN's residence located at 3007 W. Weaver Street, apartment 9, Durham, North Carolina (SUBJECT PREMISES) which is also known as the Cornwallis Projects. Additionally, JOHNSON utilizes the residence located at 2230 Lafayette Street, Durham, NC, to store and distribute narcotics. During this investigation it was determined that KHURAM CHOUDHRY was

utilizing his apartment located at 5710 Arringdon Park Drive, Morrisville, NC, and his SecureCare storage unit, located at 5311 NC Hwy 55, Unit 216, Durham, NC to distribute cocaine and fentanyl. Lastly, this investigation has determined that JAMAAL ROBERTSON, who recently got off federal supervised release, is utilizing his residence at 500 Cascade Falls Lane, apartment 305, Durham, NC to store and distribute fentanyl.

10. During the course of this investigation, investigators have conducted multiple undercover purchases of fentanyl from JOHNSON. For example, on February 27, 2025, members of the Durham County Sheriff's Office (DCSO) conducted a controlled purchase of narcotics from JOHNSON utilizing UCE-1 (Undercover Employee[1]). On February 26 and 27, UCE-1 contacted JOHNSON on TT1 to arrange the deal. JOHNSON agreed to sell UCE-1 one ounce of fentanyl for $1,400. They agreed to meet at the Family Fare gas station located at 102 Cornwallis Road, Durham, North Carolina. At approximately 6:30pm, UCE-1 arrived at the gas station and called JOHNSON to advise they were there. JOHNSON handed UCE-1 a package of suspected fentanyl and UCE-1 handed JOHNSON $1,400. The buy was audio and video recorded by UCE-1. The suspected fentanyl weighed approximately 30.8 grams and field tested positive for the presence of fentanyl. Law enforcement units conducted physical surveillance in the area of the gas station before, during, and after the buy. JOHNSON was seen leaving the gas station several minutes after UCE-1 left the area. JOHNSON appeared to do another hand-to-hand transaction with an unknown individual parked at the gas station in an older model, dark in color Mercedes sedan. After JOHNSON left the Mercedes, he walked to an adjacent parking lot and got into the passenger side door of a white in color Volkswagen sedan. The Volkswagen left the parking lot and immediately turned into the entrance to the Cornwallis Housing Project, turned around, and parked facing the

---

[1] This undercover employee is a detective with the Durham County Sheriff's Office.

direction of the Family Fare gas station[2]. The Cornwallis Housing Project is the location of one of JOHNSON's stash locations, 3007 W. Weaver Street, Apartment 9, Durham, NC (SUBJECT PREMISES).

11. On April 1, 2025, at approximately 11:26pm JOHNSON (TT1) made a call to an associate where JOHNSON stated, "It took me a long time to get the 'wop' [UI], but that shit paid off man...On my momma life. It ain't, it wouldn't, it's not gonna take you as long as it took me, like to do anything. Cause I ain't... have nobody to do that. I had to go all the way to the trenches. Like, getting it from nothing, like...like, you know what I'm saying. So, only reason why I really got to expand man. I don't deal with too many people man. I, I can't, cause niggas ain't real. And motherfuckers they tryin to God damn, motherfuckers don't really be trying to get no money. Like real talk man. [UI] I just pulled up, I was in the wrong, in the, in the right car at the right time. My nigga, one of my niggas, man [UI], my nigga, he an Arab [known to be CHOUDHRY]. He just had like, he just had like a life sentence, right. He was at Bertie [Bertie Correctional Institute] with me. He went home he did like 13 years. He went home [UI], I came home three years after he did. And my lawyer got us together, 'cause he got trucks and shit. So, when I got, when they [UI] when they hit my crib fucking with dads and them and I lost shit and I needed some work and I went and got on the block, know what I'm sayin? And they [UI] and that shit put me in the game... [UI] $1,000 and [UI] and takin nigga's shit and killin and shootin niggas [UI], so then they knew my prison stay was [UI], right, [UI] but it really was." Based on training, knowledge, experience, and this investigation, your affiant is aware that JOHNSON was discussing meeting CHOUDHRY in Bertie Correctional Institute, where they were both housed from July 2017 through May 2018.

---

[2] Based on training, knowledge, and experience, JOHNSON was likely conducting counter-surveillance and looking for any undercover law enforcement vehicles conducting surveillance on him.

6

Through this investigation, I know CHOUDHRY owns a trucking LLC that is registered in his name.

12.  On April 2, 2025, JOHNSON received an incoming call (TT1) and the caller asked JOHNSON to meet him. This meeting was surveilled, and agents observed JOHNSON meet with this male behind the EconoLodge on Hwy55 in Durham and conduct a hand-to-hand transaction. Based on training, knowledge, and experience your affiant believes that JOHNSON provided drugs to this male. This male, known to agents from this investigation and court-authorized wire interceptions, was a frequent drug customer of JOHNSON's. After this deal, JOHNSON's geolocation data indicated that he traveled to CHOUDHRY's apartment at 5710 Arringdon Park Drive, apartment 1402, Morrisville, NC.

13.  On April 6, 2025, JOHNSON received an incoming call from a female "J.F." (TT1) in which she asked JOHNSON to "pull up on her". Based on training, knowledge, and experience your affiant knows that J.F. was ordering drugs from JOHNSON and wanted him to come deliver them to her. J.F. was a frequent drug customer of JOHNSON's, and is known to your affiant based on this investigation, surveillance operations, and court-authorized wire intercepts. JOHNSON agreed and told JF he would meet her in fifteen minutes. Court-authorized geolocation data showed that JOHNSON left his apartment (5114 Copper Ridge Ln, Apt 303, Durham, NC) and traveled directly to 3007 W. Weaver Street, apartment 9, Durham, NC (Cornwallis Projects) (SUBJECT PREMISES). Based on the court-authorized geolocation data, JOHNSON was there for just a few minutes, then departed and met with J.F. to provide her with drugs. Based on training, knowledge, and experience your affiant knows that drug dealers will often make very brief stops at stash locations to pick up the drugs to sell as opposed to having drugs on them all of the time. Additionally, after departing his apartment on Copper Ridge Lane, he received a call (TT2) from

a known associate, "C.H.", in which she asked how much longer he was going to be before he met her. Based on training, knowledge, and experience your affiant knows that C.H. was waiting for JOHNSON to deliver drugs in the same manner as described for J.F. She was instructed by JOHNSON to meet him in Cornwallis. Your affiant knows that 3007 W. Weaver Street, Apartment 9 (SUBJECT PREMISES) is in the Housing Project known as Cornwallis. Based on training, knowledge, and experience your affiant believes that JOHNSON traveled to Cornwallis neighborhood, specifically 3007 W. Weaver St, Apt 9, Durham, NC (SUBJECT PREMISES) to get narcotics that were stashed at the residence to provide to both C.H. and J.F.

14. On April 10, 2025, JOHNSON made an outgoing call (TT1) to JAMAAL ROBERTSON. JOHNSON instructed ROBERTSON to go to the West End neighborhood of Durham and pick "it" up. Based on court authorized geolocation data, JOHNSON departed his apartment at 5114 Copper Ridge Ln, Apt 303, Durham, NC. Surveillance units traveled to the West End and observed JOHNSON arrive at 2230 Lafayette Street, Durham, NC in his blue Mercedes. JOHNSON went into 2230 Lafayette Street for approximately seven minutes and then departed. JOHNSON traveled to the Food Lion in the West End and surveillance units observed JOHNSON meet with ROBERTSON. They observed the hand-to-hand narcotics transaction after which both suspects returned to their cars and departed. A search of law enforcement database revealed that JAMAAL ROBERTSON recently got off Federal Supervised Release. Additionally, the FBI was informed that the previous day, April 9, 2025, the Raleigh Police Department conducted a controlled purchase of cocaine and fentanyl from ROBERTSON. Based on training, knowledge, and experience your affiant knows that ROBERTSON is selling fentanyl and cocaine, that he is being supplied with those drugs from JOHNSON, and that JOHNSON is utilizing 2230 Lafayette Street, among other locations, to maintain his illegal drugs. On both occasions, the buy from JOHNSON,

8

and the sale to an undercover agent with the Raleigh Police Department, ROBERTSON was surveilled back to his apartment located at 500 Cascade Falls Lane, Apt 305, Durham, NC. Based on training, knowledge, experience, and involvement in this investigation your affiant believes that ROBERTSON is distributing fentanyl and maintaining those narcotics in his residence located at 500 Cascade Falls Lane, Apt 305, Durham, NC.

15. On April 13, 2025, court authorized geolocation data showed that JOHNSON departed his residence (Copper Ridge) and traveled directly to 2230 Lafayette Street, Durham, NC. He remained at the residence for approximately thirty minutes. He departed and traveled to the Shell gas station on Hope Valley Road in Durham. Surveillance units observed JOHNSON meeting with JAMAAL ROBERTSON at the store. Both JOHNSON and ROBERTSON left the store at the same time, and both traveled to JOHNSON's apartment complex (Copper Ridge). Surveillance units were unable to observe what occurred in the lot. Immediately following this deal, JOHNSON spoke to JERRELL GREEN on TT2 in which he told him he had to come out because "fentanyl was in the air." Based on training, knowledge, experience, and involvement in this investigation your affiant knows that JOHNSON departed his residence (Copper Ridge) and distributed fentanyl to ROBERTSON. He then bragged about this to his coconspirator, GREEN. Based on this investigation, specifically surveillance operations, court-authorized wire intercepts, and recent local police arrests, your affiant is aware that GREEN is a narcotics dealer in Durham, he is being supplied by JOHNSON, and he is maintaining a dwelling to distribute narcotics in Cornwallis (3007 W. Weaver Street, Apt 9, Durham, NC - SUBJECT PREMISES). More specifically, on March 21, 2025, the Durham Police Department arrested GREEN after a short foot pursuit in the vicinity of Cornwallis Housing Project. The DPD Gang Unit observed what they believed to be narcotics transactions of which involved GREEN. When a marked patrol car entered the area,

9

GREEN fled on foot. He was apprehended and the following items were recovered from his person or in the vicinity of his arrest:

    a. Fentanyl in a plastic bag, weighing 17 grams[3]

    b. Fentanyl in a plastic bag, weighing .2 grams

    c. Fentanyl in a plastic bag, weighing 9.6 grams

    d. Cocaine in a plastic bag, weighing 2.4 grams

    e. Marijuana in a plastic bag, weighing 4.8 grams

    f. $274.00 in US Currency

    g. digital scale

    h. black Motorola cell phone

17. On April 25, 2025, at approximately 1600 hours, law enforcement investigators began conducting physical surveillance at the apartment complex of KHURAM CHOUDHRY. At approximately 1615 hours CHOUDHRY and his girlfriend, "W.R." were observed leaving together in a Chevrolet Malibu registered to W.R. They were not in possession of any bags at this time. Based on CHOUDHRY's phone geo-location data, they traveled to the area of Highway 55 and Interstate 40. Approximately 30 minutes later, CHOUDHRY and W.R. returned to the apartment complex. CHOUDHRY was observed carrying two bags from the vehicle to his apartment that he was not in possession of prior to going to the storage unit. Based on court-authorized geolocation data, CHOUDHRY and W.R. traveled to SecureCare Self Storage located at 5311 NC Highway 55 in Durham[4].

---

[3] Items a, b, and c all field tested positive for fentanyl and item d field tested positive for cocaine.
[4] On May 1, 2025, an admin subpoena was served on SecureCare Self Storage for information concerning any accounts associated with CHOUDHRY. The business provided records indicating that CHOUDHRY was renting storage unit # 216. Based on training, knowledge, and experience your affiant knows

10

18. On April 25, 2025, approximately 10 minutes after CHOUDHRY and W.R. returned from the storage unit and entered the apartment with the two bags, another male, later identified as DWIGHT DEWAYNE CHANDLER JR, was observed entering the apartment complex. At approximately 1705 hours, CHOUDHRY and CHANDLER met in front of CHOUDHRY's apartment and then walked inside. Just six minutes later, CHANDLER was observed exiting the apartment now carrying a white garbage bag that he was not seen entering the apartment with. CHANDLER took the trash bag with him as he entered his vehicle. CHANDLER sat in his vehicle in the apartment parking lot and was observed by surveillance units manipulating something in the vehicle. While still in the apartment parking lot, CHANDLER exited his vehicle, now holding a grey cloth bag while talking on the phone. CHANDLER returned to his car and then exited the lot. Based on training, knowledge, and experience your affiant believes that CHANDLER transferred narcotics from the white bag provided by CHOUDHRY to the grey cloth bag that he had inside of his vehicle.

19. Investigators followed CHANDLER as he exited the apartment complex and drove west on Chin Page Road in Durham, North Carolina. CHANDLER drove for approximately five minutes and pulled into the parking lot of "The House" restaurant located at 4310 South Miami Blvd, Durham NC.

20. CHANDLER and an unknown male spoke in the parking lot for approximately thirty-five minutes before investigators observed CHANDLER retrieve the grey cloth bag from his vehicle. CHANDLER stood at the rear of his vehicle and at approximately 1845 hours a small green Kia SUV entered the parking lot and was waved over by CHANDLER. CHANDLER was observed entering the Kia SUV holding the grey cloth bag. Moments later the Kia SUV and the

---

narcotics traffickers to utilize storage units, in conjunction with their residence, as a place to maintain narcotics and illicit proceeds.

Chrysler 300 both left the parking lot and split up approximately one mile later. Investigators continued following CHANDLER in the green Kia SUV. The Kia traveled north on the NC147 Freeway in the direction of downtown Durham.

21. Deputies with the Durham County Sheriff's Office conducted a traffic stop on the Kia for NC Chapter 20 (traffic) violations as the vehicle exited NC147 and turned south on Fayetteville Street. The driver pulled over immediately. The Kia was driven by an Asian female that was driving for the ride-share company "Lyft" and CHANDLER was a fare that she had picked up.

22. After Deputies identified the driver and CHANDLER, they asked the owner of the vehicle for, and were granted, consent to search the Kia for contraband. CHANDLER denied ownership of the grey cloth bag in the rear seat. Additionally, a K-9 scan of the vehicle indicated the presence of narcotics. A search was conducted and inside the grey cloth bag, deputies located a "brick" of suspected cocaine that weighed approximately 1287.2 grams as packaged, and another smaller plastic bag of suspected cocaine weighing approximately 29.0 grams as packaged. Both packages field tested positive for cocaine. The outside of the larger package had been smeared with a substance that appeared to be petroleum jelly. Based on training, knowledge and experience your affiant knows that narcotics trafficker will often place things like petroleum jelly on packages of narcotics to thwart detection by police K9 units. Deputies seized both packages of suspected cocaine as well as a cell phone belonging to CHANDLER. CHANDLER was transported to the Durham County Detention Facility and charged with North Carolina narcotics trafficking related offenses. CHANDLER's bond was set at one million dollars.

23. Based on training, knowledge, experience and the documented surveillance operation, your affiant is confident that the narcotics seized from CHANDLER were provided to him by CHOUDHRY. Additionally, based on CHOUDHRY returning from the storage unit with two bags

the cocaine was maintained by CHOUDHRY both at his storage unit, SecureCare Self Storage, unit #216, locate at 5311 NC Hwy 55, Durham, NC, and then, for a brief time, maintained at his apartment 5710 Arringdon Park Dr, apartment 1402, Morrisville, NC until distributed to CHANDLER.

### Scheduled Trip to New Jersey to Pick up Narcotics

24. Through the court-authorized monitoring of CHOUDHRY's telephone (TT3), investigators have determined that CHOUDHRY has planned to go to New Jersey to meet his source of supply and purchase a large quantity of narcotics. Surveillance units have observed CHOUDHRY preparing a 20' box truck, registered to his trucking company for this trip. He is planning on making this trip with J.C. This is more fully described in the paragraphs below.

25. On April 30, 2025, CHOUDHRY (TT3) received a call. In this call CHOUDHRY explained that he was being undercut by the guy in New Jersey. CHOUDHRY referred to getting "tires" from them. In this call he refers to a high-ranking Blood gang member in North Carolina that he deals with that claimed he could do, "50 [kilograms] a month quick...no problem." CHOUDHRY spoke about money issues between himself and this male and then claimed he would show screen images saved on his phone of these conversations. Based on training, knowledge and experience your affiant believes that CHOUDHRY is upset with his drug supplier in New Jersey but is scheduled to travel there to pick a large load of "tires" (kilograms of cocaine).

26. On April 30, 2025, CHOUDHRY (TT3) placed a call to his girlfriend, W.R. In this call CHOUDHRY explained that he was about to make a play[5] and that would get paid out for six months. Based on training, knowledge and experience your affiant believes that CHOUDHRY

---

[5] Based on training, knowledge, and experience your affiant knows "making a play" to be terminology used by those involved in narcotics to refer to a drug deal.

described a planned trip to New Jersey to pick up an extremely large amount of cocaine that would allow them to make money from its sale for six months.

27. On May 1, 2025, CHOUDHRY, at approximately 2100 hours, departed his residence (5710 Arringdon Park Drive, Apt 1402, Morrisville, NC) and met J.C. at the SecureCare Self Storage unit located at 5311 NC Hwy 55, Durham, NC (Storage unit 216). They were at the storage unit for approximately five minutes. When CHOUDHRY departed the storage unit he placed a call (TT3) to J.C. CHOUDHRY stated, "That's my life right there bro." J.C. replied, "Say no more bro…We'll hit it in the morning." Based on training, knowledge, experience, and involvement in this investigation, your affiant believes that CHOUDHRY met with J.C. at the storage unit to retrieve bulk cash in preparation for their trip in the morning to New Jersey to purchase a large quantity of cocaine from CHOUDHRY's supplier. This investigation has shown that J.C. is a very close associate of CHOUDHRY's and actively involved in the conspiracy to distribute large amounts of cocaine.

28. Based on the above-documented intelligence gathered during the interception of wire communications on TT1, TT2, TT3, and TT4, your affiant is extremely confident that KEVIN JOHNSON, KHURAM CHOUDHRY, DWIGHT CHANDLER, JERRELL GREEN, and others are involved in a drug trafficking conspiracy. Specifically, CHOUDHRY is traveling interstate for the purpose of trafficking large quantities of narcotics back to the Middle District of North Carolina, and that some of those narcotics and associated illicit proceeds are maintained at the SUBJECT PREMISES.

## CONCLUSION

29. Based on the forgoing facts, I submit that there is an ongoing drug distribution conspiracy and that one of its main conspirators, KEVIN JOHNSON, is maintaining the SUBJECT

PREMISES for purposes of this narcotics conspiracy. Through the investigation into this drug distribution organization, I have determined that JOHNSON, and GREEN, are currently using the SUBJECT PREMISES to store, maintain, and distribute large amounts of narcotics. Based on training, knowledge, and experience, I know that drug dealers will often maintain drug proceeds, and firearms, inside of their primary residence. I submit that there is probable cause that the SUBJECT PREMISES contains associated records, ledgers, and illicit proceeds, that provide evidence of the above-described criminal conspiracy.

30. Based on the foregoing facts, I further respectfully submit that there is probable cause to search the SUBJECT PREMISES described in Attachment A to seize evidence, contraband, fruits, and/or instrumentalities of crimes, namely, violations of 21 U.S.C. § 846, Conspiracy to Distribute Cocaine and Fentanyl and 21 U.S.C. § 841, Possession with Intent to Distribute Cocaine Fentanyl.

/s/ Eric S. Nye
Eric S. Nye, Special Agent
Federal Bureau of Investigation
United States Department of Justice

Dated: May, 2 2025

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

Joi Elizabeth Peake
United States Magistrate Judge
Middle District of North Carolina

## ATTACHMENT A

## PREMISES TO BE SEARCHED:

The subject premises, **3007 W. Weaver Street, Apt 9, Durham, North Carolina**, is a duplex building with a brick facade. The building has "3007" affixed to the beige siding. The Subject Premises is the unit to the left (squared in green below) with "3007 9" hanging in a lit sign above the front door.



16

## ATTACHMENT B

## ITEMS TO BE SEIZED:

Documents and items which provide evidence of violations of Title 21, United States Code, Section 841 and 846, in the form of the following:

- Any and all Controlled Dangerous Substances (CDS) and or items containing CDS residue;
- Cutting agents/adulterants commonly utilized in the preparation of narcotics;
- Digital scales;
- Baggies and other packaging paraphernalia;
- Blenders, vacuum sealers/food savers;
- Ledgers or notes associated with the sale of narcotics and collection of associated proceeds;
- U.S. currency;
- Jewelry and other valuable items;
- Cellular telephones, a separate warrant will be obtained for any phones;
- Laptops and digital storage devices;
- Documents indicating residency;
- Safes or secured storage containers;
- Pictures or other documents showing association with known conspirators.